FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAR 17 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

PATRICK HENRY, DINAH HENRY, THE )
UNITED ISRAEL CHURCH, UIC, THE )
CERES TRUST, and BORNE )
INVESTMENTS, )
                        )
      Plaintiffs, )
                        )
v. )   No.  08-CV-138-J
                        )
PRO 10 ORIGINALS, LLC and )
GERALD DOERR, )
                        )
      Defendants. )

## OPINION STATING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THE ABOVE CAPTIONED MATTER came before the Court commencing

June 3, 2009 for a non-jury trial.  Counsel at trial for plaintiffs was Timothy C.

Kingston of Cheyenne, Wyoming; counsel at trial for defendants was John c.

Coppede of Cheyenne, Wyoming.  The Court, having duly tried the issues and

being fully advised in the premises, FINDS and CONCLUDES as follows:

1

1. This is an action for trademark infringement brought pursuant to 15 U.S.C. § 1125(a).[1]  The following facts are not controverted:

(a) Pro 10 Originals LLC is a Wyoming Limited Liability Company, and was organized on or about June 7, 2001.  Since that date it has manufactured, distributed and sold certain products under the mark "UNKER'S."

(b) Gerald Doerr is the owner of Pro 10 Originals, LLC, and has been since it was organized on or about June 7, 2001.

(c)   Unkers International was a Nevada limited liability company that was organized by Jerry Doerr.

(d)   The trustees of "Ceres Trust" and "Borne Investments" have not been joined as parties to this action even though the alleged trust entities themselves are named as plaintiffs.

(e) The plaintiffs have used the mark Unker's or UNKER's for approximately 18 years prior to the defendants' first use of the mark.

(f) The Unker's or UNKER's mark is fanciful and arbitrary.

---

[1]Prior to trial, plaintiffs abandoned their claims under 15 U.S.C. § 1114 and their state law claims for violation of the Wyoming Trademarks and Service marks Act, Wyo. Stat. §§ 40-10-101 -- 106.

(g) The defendants have used the Unker's or UNKER's mark

in connection with the sale of goods.

(h) There is a likelihood of confusion between the parties due

to the defendants' use of the mark.

(i) There have been at least several instances of actual

confusion between the parties due to the defendants' use of the

mark.

2.  Title 15 U.S.C. § 1125(a) provides:

(1)   Any person who, on or in connection with any goods or
services, or any container for goods, uses in commerce any
word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of
fact, which–

(A) is likely to cause confusion, or to cause mistake, or to
deceive as to the affiliation, connection, or association of
such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services or
commercial activities by another person, * * *

shall be liable in a civil action by any person who believes that he
or she is likely to be damaged by such act.

3.    In order to prevail on a common law trademark infringement claim

brought under Section 1125(a), a party must prove three things.  A plaintiff:

must [first] show that the mark is protectable.  In addition, [the plaintiff]

3

must demonstrate that Defendants used the trademark "in connection with any goods or services." Finally, [the plaintiff] must establish that Defendants' use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities of another person."

Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research, 527 F.3d 1045, 1050 (10th Cir. 2008) (citations omitted).

4.     In addition, the plaintiffs must prove that they are senior users of the mark, senior to any use by the defendants or others. First Savings Bank, FSB v. US Bancorp, 117 F. Supp.2d 1061, 1070 (D.Kan. 2000) ("the trademark rights of the senior user trump those of the junior user") (quoting Laurel Capital Group, Inc. v. BT Financial Corp., 45 F. Supp.2d 469, 481 (W.D.Pa. 1999)). The senior user is typically the first to use the mark and "in the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question, and that the trademark rights of the senior user trump those of the junior user." ACCU Personnel, Inc. v. AccuStaff, Inc., 846 F. Supp. 1191, 1204-05 (D.Del. 1994) (citing Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415 (1916)). The parties have also stipulated that "the plaintiffs have used the mark Unker's or UNKER'S for approximately 18 years prior to the defendants' first use of the mark." See

4

Final Pretrial Order, "Uncontroverted Facts," page 21, ¶ (e).

5.      Based on these several stipulations, the plaintiffs have met their burden of proof with regard to their Section 1125(a) trademark infringement claim. At the trial of this case, with regard to their common law infringement claim, the plaintiffs rested except with regard to the damages they claimed for the infringement. The defendants then proceeded to present their evidence on their several affirmative defenses. If proven, the defendants' affirmative defenses would defeat the plaintiffs' infringement claim.

6.      In their affirmative defenses, the defendants allege:

A.      That the plaintiffs do not hold a registered trademark in the name "Unker's" or "UNKER'S" and, therefore, they cannot maintain their claim under 15 U.S.C. § 1114.

B.      That the plaintiffs' interest in the mark was foreclosed on, sold, conveyed or transferred prior to 2002.

C.      That the plaintiffs have failed to join essential parties to this case.

D.      That the plaintiffs have not continuously made and manufactured products using the mark since 1982.

7. Because the plaintiffs did not proceed with their Section 1114 claim, the Court need not consider the defendants' first affirmative defense set forth above.

8. The defendants' second and fourth affirmative defenses raise two basic factual and legal claims: (1) that the plaintiffs' gave a "naked license" in the mark either to the person named Mose Miller for the period from 1995 to 2000, or they gave a "naked license" to the defendants from 2000 to April 10, 2001, and (2) that the plaintiffs irrevocably transferred to the defendants the plaintiffs' entire business relating to the manufacture and sale of products with the Unker's name and that transfer included the name "Unker's" or "UNKER'S."

9. With regard to the defendants' "naked license" affirmative defense, the Court finds and holds as follows. Many trademark owners or holders license to third parties the manufacture and/or sale of their products with an associated trademarked name. At trial, the plaintiffs presented the uncontradicted testimony of their expert Ken Shirley, a contract manufacturer, who described in detail how such licensing processes often work in the personal care industry. See Transcript, Vol. I at 31-51 and 55-86. Under certain circumstances, a license may constitute a "naked" license to a third party when the licensor exercises little or no quality control over the products or services marketed by

6

the licensee. Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 871 (10th Cir. 1995), *cert. denied*, 516 U.S. 920, 116 S.Ct. 341 (1995) (citing Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959)). The "naked license" doctrine was developed by the courts in order to protect consumers who believe that because they buy a product or service under a certain name that the products or goods they receive have a certain quality associated with the trademark. 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 18:48 (2008). In order to protect consumers, the trademark owner has the duty to exercise a certain modicum of control over the quality of the goods or services provided by its licensee. Dawn Donut, 267 F.2d at 367; Stanfield, 52 F.3d at 871.

10.    Naked licensing can result in "abandonment" or forfeiture of a mark. 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 18:48, 18-104 (2008); Stanfield, 52 F.3d at 871. Because a finding of naked licensing may be harsh -- the loss of a trademark -- the amount of quality control necessary to find that naked licensing has not occurred is minimal. Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977) ("Retention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open

7

market. We must determine whether Kentucky Fried has abandoned quality control"); Westco Group, Inc. v. K.B. and Assocs., Inc., 128 F. Supp.2d 1082, 1091 (N.D.Ohio 2001); Hurricane Fence Co. v. A-1 Hurricane Fence Co., 468 F. Supp. 975, 988-89 (S.D.Ala. 1979) (only "minimal quality control" ought to be required); see also Stanfield, 52 F.3d at 871 (when a trademark owner engages in naked licensing, without any quality control, he may lose rights in mark).

11. Evidence of control may be found in both the contractual arrangements between the parties, as well as actual evidence of control. See Stanfield, 52 F.3d at 871. The Tenth Circuit has held that "[b]ecause a finding of insufficient control results in the forfeiture of a mark, a party asserting insufficient control by a licensor must meet a high burden of proof." Stanfield, 52 F.3d at 867 (citing Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985)). In this case, therefore, the defendants carry a heavy evidentiary burden to establish that the plaintiffs exercised little or no control over the manufacture and sale of the Unker's products by either Mose Miller or the defendants and thereby conferred a naked license on either of them.

12. The Tenth Circuit has also held that a "naked license" defense may

8

not raise facts showing lack of quality control that occurred during the term of

the license. Rather, only facts showing lack of control that occurred after the

term or period of the license are relevant to the defense. Creative Gifts, Inc.

v. UFO, 235 F.3d 540, 548 (10th Cir. 2000) (in making naked license claim,

licensee is estopped or barred from raising facts occurring during the term of

the license, only post-license facts can be raised):

> Although the licensee estoppel rule in patent cases was struck down in
> Lear v. Adkins, 395 U.S. 653 (1969), with only a few exceptions the case
> law since then has held the Lear non-estoppel rule inapplicable in the
> trademark context . . . The licensee is estopped from claiming any rights
> against the licensor which are inconsistent with the terms of the license.
> This is true even after the license expires.  He is estopped from
> contesting the validity of the mark, . . . or challenging the license
> agreement as void or against public policy, e.g., because it granted a
> naked license.  But he may challenge the licensor's title to the mark
> based on events which occurred *after* the license expired.

Creative Gifts, 253 F.3d at 548 (quoting 3 Rudolf Callmann, Unfair Competition,

Trademark and Monopolies § 19.48, at 434 (Louis Altman 4th ed. 1998 and

2000 Cum. Supp.)) (emphasis original); Westco Group, Inc. v. K.B. & Assocs.,

Inc., 128 F. Supp.2d 1082, 1089 (N.D.Ohio 2001) ("The majority of courts to

consider the issue in the wake of Prichard have found that the doctrine of

licensee estoppel bars a licensee from asserting a naked licensing offense.")

(citing Creative Gifts and E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc., 90

9

F. Supp.2d 277, 291 (S.D.N.Y. 2000)).

13.    The Court first finds that the defendants are estopped or barred from asserting their "naked license" affirmative defense. The only evidence presented by the defendants at trial focused on the plaintiffs' failure to exercise quality control during the period of time that defendant Gerald Doerr was ostensibly operating under a license from the plaintiffs to make and market Unker's products. Therefore, under Creative Gifts, that evidence may not be considered for the purposes of determining whether the plaintiffs' "license" to the defendants was a naked license.

14.    The defendants also presented evidence of what they saw to be the lack of quality control exercised by the plaintiffs over the operations of Mose Miller. However, the Court finds that the defendants cannot rely on the relationship between Mose Miller and the plaintiffs to make out their naked licensing claim. As set forth in Creative Gifts, the only evidence that may be considered are post-license facts. Obviously, the plaintiffs' working relationship with Mose Miller was prior to that of the defendants' relationship. Therefore, that evidence cannot and will not be considered.

15.    In addition, the Court rejects the defendants' position that events taking place during the Mose Miller era did not take place during the

10

defendants' license period and, therefore, they may raise them.   For a successor licensee to attempt to claim that a licensor has lost his mark because a prior licensee had a naked license makes no legal or logical sense.  If it did, a subsequent licensee, no matter how great the control the licensor had over his license, could always try to find some prior licensee whose relationship with the licensor had been different and then seek to claim the mark based on the prior naked license.  That would fly in the face of the equitable or fairness considerations embodied in the licensee estoppel rule -- that a licensee, who enjoys the benefits of a license, should not be allowed to challenge the license and thereby gain control of the trademark.  Westco, 128 F. Supp.2d at 1089 ("By entering into the license agreement, the licensee recognizes the licensor's ownership of the mark and by implication, covenants not to challenge the licensor's rights.").  Therefore, the Court rejects any reliance on the nature of the business relationship between the plaintiffs and Mose Miller as evidence of or support for the defendants' "naked license" defense.

16.   Alternatively, if the Court were to consider the merits of the defendants' naked license claim, the Court, based on the facts presented at trial, finds and holds that the defendants did not meet their heavy burden of proof to show that the plaintiffs conferred on either Mr. Miller or the defendants

11

a naked license. With regard to Mr. Miller, the evidence showed that the plaintiffs exercised a significant amount of quality control over his manufacture and marketing of the Unker's products.

17.   As Mr. Miller testified in his deposition,[2] see Mose Miller Deposition at pages 10 and 73-76, and as plaintiff Patrick Henry testified at trial, for the entire period of time that Mr. Miller made and sold Unker's products, the plaintiffs, principally Mr. Henry, kept strict control over the formula for the active ingredients, the "essential oils," that went into the Unker's products. The essential oils are the components of the Unker's products that make them unique and, the parties agree, make the products effective and functional. The parties also agree that throughout the Mose Miller era Mr. Henry, in addition to never sharing the formula for the essential oils with Mr. Miller, always mixed the essential oils himself and then shipped them to Mr. Miller who then in turn mixed the essential oils with petroleum base and other inactive materials to finish preparation of the Unker's products. The Court considers that Mr. Henry's retention of the formula and his exclusive preparation and mixing of the active ingredients, the essential oils, of the Unker's products constituted more than minimal quality control over the Unker's products made and sold by Mr. Miller.

_____

[2]The parties jointly submitted Mr. Miller's deposition into evidence at trial.

By retaining the formula and mixing the essential ingredients, Mr. Henry and the plaintiffs exercised direct, ongoing and significant quality control over the Unker's products. There was no "naked license" during the period of time Mr. Miller worked with the plaintiffs.

18.    The same holds true for the year and several months that the defendants worked with the plaintiffs in making and marketing Unker's products, whether that relationship may be characterized as a "license" or otherwise. Just as during the Mose Miller period, throughout the entire period of time that the parties worked together, Mr. Henry retained both exclusive knowledge of the formula[3] and mixed and shipped the essential oils to the defendants. See Transcript, Vol. V at 519 - 521. By this mechanism, Mr. Henry

_____

[3]There was evidence presented at trial that Mr. Henry, at Defendant Doerr's request, provided Doerr with a version of the formula. However, Mr. Doerr also testified that the formula he was provided by Mr. Henry was not, in fact, the correct formula. Also, Mr. Doerr testified that though he had been provided a formula, during the entire period of time he worked with the Plaintiffs he never used the formula for any purpose and he never mixed his own essential oils, but relied on Mr. Henry to ship them to him. See Trial Transcript at pages 267 - 270 and page 338. There was also evidence during trial that Mr. Henry had taken or copied the formula from his Uncle Lester Skinner without his permission and used the formula to start his own business manufacturing the salve in 1982. See Transcript Vol. V at 571-573. Mr. Henry testified he did not believe the formula was protected or patentable and that it was public knowledge and had actually been published in a book available to the general public. Transcript Vol. IV at 353-354.

13

kept control over the operations of Mr. Doerr and exercised significant quality control over the Unker's products sold by the defendants.[4]  Mr. Doerr also testified he talked with Mr. Henry frequently about the business.  By way of example:

Q.     All right.  Now, you also testified that Mr. Henry
       wanted you to maintain the -- pardon me, not to
       maintain, but to set up the facility where you would
       make  ultimately  the  Unker's  products  in  Upton,
       Wyoming; correct?

A.     He was desirous to have it there, yes.

Q.     Okay.  And why -- what do you understand the reason
       that he wanted that to be the case?

A.     Well, it was being manufactured and distributed out in
       Ohio, and he wanted it closer to him.

Q.     Okay.  And did he want it in Upton for a particular

---

[4]This evidence was supported by the uncontradicted testimony of the Plaintiffs' expert Ken Shirley.  Mr. Shirley, himself a contract manufacturer in the personal care industry, testified that the Plaintiffs' business arrangements with Mr. Miller and the Defendants were not outside the norm for contract manufacturing in the industry.  In addition, Mr. Shirley testified that, in his experience within the industry, trademark holders do not lose their trademarks to the entities that make products for them. See Trial Transcript at 69 - 78.

purpose?

A.    I don't know that.

Q.    Did he want it in Upton because he wanted to keep
      control over the product because it would be there
      close to him in Upton?

MR. COPPEDE: Objection: speculation, Your Honor.

THE COURT: Well, it's a question. Did he tell you that?

THE WITNESS: No.

Q.    (BY MR. KINGSTON) Did he -- what did he ever tell
      you about why he wanted the facility to be located in
      Upton, Wyoming?

A.    I don't know. I don't remember -- recall that at all.

Q.    You just can recall what he said one way or the other?

A.    Yes.

Q.    All right. Now, you also said that you changed the --
      you described how you changed the labels for the
      product sometime after you started being involved in
      making and selling Unker's; correct?

A.    Yes.

15

Q.    All right.  And you also stated that you contacted Mr.

      Henry to discuss that issue with him; correct?

A.    Um, we talked all the time, and I'm sure we talked

      about the label changes.

Q.    And were you asking his permission to make the label

      changes?

A.    No.

Q.    Why did you feel it was necessary to contact him about

      the label changes that you were making?

A.    Like I said, I was in contact with him all the time just

      telling him what was going on, what we were

      accomplishing.  It all mattered to him because the

      more products that we were able to sell, the more

      money he would be able to make.

Q.    Isn't that another example, that is, Mr. Henry's interest

      in the labels, to show that he wanted to keep control

      over the product?

MR. COPPEDE:  Objection.

A.    No, he didn't, didn't have any say-so whatsoever.  We

16

just told him what we were doing.

Q.    (BY MR. KINGSTON)  But you felt it was necessary to
      tell him; correct?

A.    No, not necessarily.  I just did it out of courtesy.

Q.    Even though you are testifying that it's, quote, your
      business?

A.    It is, yes, it is.

Q.    Now with regard to Mose Miller, we've already had in
      evidence the letter that you dictated to -- is it Kip
      Croft?

A.    Kimball.

Q.    Kimball, I'm sorry.

A.    That's fine.

Q.    I know a Kip Crofts.  I get them mixed up all the time.

      Kimball Croft.  You caused him to write that
      letter to Mose Miller; correct?

A.    Yes.

Q.    And I think that's exhibit -- I apologize -- Exhibit C.

      And I believe you testified that you were

17

relegating -- or let me start over. I believe you also testified that you had told Mr. Miller when you came on the scene that he was going to be relegated to only being a contract manufacturer; correct?

A. Correct.

Q. And he never argued with you regard to that; correct?

A. That's correct. The way I approached him was with our marketing efforts we anticipated some much larger sales, and so for the most -- or the more product he produced or was able to fill then the more money he would make.

Q. Do you feel that Mose Miller ever had any rights or ownership in the trademark, excuse me, the mark Unker's?

A. I did after we did some discovery when -- as I found out that Patrick had completely quit the manufacturing, distribution of the product in '95 and Mose took over the product, so Mose was actually Unker's at the time.

Q. But at the time you wrote Mr. -- or had that letter

18

written to Mr. Miller and sent it to him, you certainly didn't think he had any rights in the trademark, did you?

A.    Not at that particular time.

Q.    And I guess -- strike that.

And did Mr. Miller ever put up any resistance, argue, claim, assert that he had any rights in the name itself to you?

A.    No.

Q.    I think there was a little bit of a disagreement with Mr. Miller in that he had some inventory of Unker's products that he wanted to sell and -- do you recall that?

A.    Very vaguely, but I wouldn't be able to testify to anything on that.

Q.    All right. I'll go on.

Now, you've -- you also testified about how there was initially a trademark application that was submitted by Unker's International in -- well, tell me

19

what year that --

A.    March of 2000.

Q.    Okay.  And then there -- that was submitted to, what,

       the United States Patent and Trademark Office?  Do I

       have that right?

A.    Yes.

Q.    And at the time it was initially turned down by the

       office; correct?

A.    That's correct.

Q.    And you never pursued or appealed or otherwise

       challenged that initial determination by the PTO with

       regard to that decision; right?

A.    We didn't.  I did not understand trademark law, nor did

       my attorney, and it was turned down -- their

       explanation was no more than a surname so it was,

       under my layman's thought or abilities, was it was not

       a trademarkable name.

Transcript, Vol. III at 293-297.

        19.    In addition, Mr. Henry limited in writing the defendants'

manufacture of the Unker's products and their access to the essential oils and active ingredients. Plaintiffs' Exhibit 53 is a document authored by Mr. Henry, dated January 22, 2000. At trial, Mr. Doerr admitted that the letter in Exhibit 53 set forth some of the terms and conditions of the agreement he had with the plaintiffs for his making and marketing of Unker's products. See Transcript, Vol. III at 318 - 326. The document states, in part:

2.    The terms and conditions concerning the formula's use will always remain with the United Israel church.

3.    The Church agrees to permit Unkers International LLC, formed by the CERES TRUST, as a legal entity in the state of Nevada, U.S.A. (EIN#83-0329116) January 10, 2000, the use of the formula in all that entails, within the guidelines set by the Church, and in compliance with the applicable rules, laws and regulations of the governing jurisdiction.

4.    It is mutually understood and agreed that the sole purpose for the existance [sic] of this LLC is to earn profits for the Ceres Trust for the trusts [sic] purpose. It is further understood and agreed that the Ceres

21

Trust maintains oversight and feduciary [sic] responsibility to the church as to compliance by Unkers International LLC.

5. The financial requirements required by United Israel church as a consideration for this useage [sic] is presently $5,000.00 (five thousand U.S. dollars) plus 10% of the GROSS REVENUE, from what ever source, paid in cash monthly by Unkers International LLC, directly to United Israel church. This payment is to be made no later than the 7th day of each month.

8. Failure of meeting the financial terms and conditions and/or other requirements constitutes default and at the sole descretion [sic] of the United Israel church lays the decision to continue to cease any part or the entire agreement. Failure of the church to act in the event of default does not annul it's [sic] right to do so at a later time.

Exhibit 53.

20. The Articles of Organization for Unkers International, LLC, were filed

22

in the state of Nevada on January 10, 2000, designating Gerald J. Doerr, Jr.

Manager, and were signed by Richard Barnwell as organizer. The second page

of Defendants' Exhibit A, captioned Articles of Organization, with a heading from

the Wyoming Secretary of State, dated March 18, 2000, provides, in part:

III. The purpose for which the limited liability company is organized is: To generate funds for the CERES Trust by the manufacture/sale/distribution of Unkers Salve.

IV. The name and address of its registered agent is: Gerald J. Doerr, Jr. * * *

VII. The right, if given, of the members of admit additional members, and the terms and conditions of the admission are: Limited to the perogative [sic] of CERES TRUST.

* * *

IX. Complete either item #1 or item #2.

1) The limited liability company is to be managed by a manager or manager. The names and addresses of the managers who are to serve as managers until the first annual meeting of the members or until their

23

>       successors are elected and qualify are:    Gerald J.
>
>       Doerr, Jr. Managing Director.

\* \* \*

Defendants' Exhibit A. Transcript, Vol. III at 283-290. Mr. Doerr acknowledged

at trial that he received Exhibit 53 in the mail in January of 2000. Transcript,

Vol. III at 318.

21.    Based on all of these facts, the Court finds and holds that the

plaintiffs did not confer on either Mose Miller or the defendants a "naked

license." The defendants did not carry their burden of proof on their second

affirmative defense.

22.    In their fourth affirmative defense, the defendants attempted to

prove that Mr. Henry and the plaintiffs irrevocably transferred to defendant

Doerr the entire Unker's business, including the Unker's name or mark. The

testimony at trial does not support the defendants' assertion.    During Mr.

Doerr's testimony on this issue, the Court asked  Mr. Doerr what he received

from Mr. Henry when he began his business relationship with him:

THE COURT:  Let me interrupt again.

THE WITNESS:  Excuse me.

THE COURT:  And what was that business?

24

THE WITNESS:  He was actually manufacturing and distributing Unker's.

THE COURT:  Okay.  And what was your business?  What did you acquire?  What was your understanding that you acquired?

THE WITNESS:  That it was -- that was going to be my business.  He -- I was actually relegating Mose back to a contract manufacturer at that point.

THE COURT:  Okay.  You didn't get any equipment?

THE WITNESS:  No.

THE COURT:  You didn't get any inventory of unused product?

THE WITNESS:  No.

THE COURT:  You didn't get a -- no bank accounts or --

THE WITNESS:  No.  The only thing that I did get from Mose was his customer list.

THE COURT:  And from Mr. Henry what did you get?

THE WITNESS:  I got some pots, some old pots and some old file cabinets.

THE COURT:  What are pots?

THE WITNESS:  They're stainless, five-gallon stainless steel pots that had a little spigot on it.  Years and years ago that's what they used to fill the

25

jars one at a time.  And there was like a 50-gallon one and maybe a 30-gallon one also.

THE COURT:  Stainless steel.

THE WITNESS:  Yes.

THE COURT:  And what else?

THE WITNESS:  A couple old file cabinets.

THE COURT:  So you hauled those away after the second meeting?

THE WITNESS:  Yes, I took them back to Worland, yes.

THE COURT:  Was there any discussion and did you obtain the right to use the name Unker's?

THE WITNESS:  As far as I knew in my talking was it was part and parcel of the business that I obtained.  Once again, all he talked about was retaining the formula.  The name, retaining the name or anything like that never came up.

THE COURT:  Did you have any thought that the formula and the name were connected in some way?

THE WITNESS:  No.

THE COURT:  And that's all you got out of it?

THE WITNESS:  Pardon me?

26

THE COURT: That is what your understanding was that you got are two stainless steel pots, some old file cabinets, and, and to do with -- do something.

THE WITNESS: The business, Unker's name, the Unker's business. Mose, as I understand later, had actually doubled the business. When I was told from Patrick that he wasn't marketing it like he thought he should, when in actuality he had doubled it from when he took it over from Patrick. So I was actually obtaining a going business at that time. I would receive all the business receipts, all the sales receipts from that. I would pay Mose, like I said, I don't remember how many pennies an ounce for him to actually fill and to ship the product directly to the customers.

THE COURT: And your obligation to -- and who did you get it from?

THE WITNESS: Patrick.

THE COURT: So you got his interest in the business.

THE WITNESS: If, if he had an interest in the business. This is what's fuzzy, you know, about all this because, as I understand now, that he offered or did the same thing with Mose, according to his deposition. He had told Mose it was his business and to do with what he liked also.

27

Transcript, Vol. II at 203-206.

23. At trial, Mr. Doerr testified Ceres Trust had no ownership interest in Unkers International. However, this testimony is not consistent with the documents noted above, including the Articles of Organization, as well as the tax return prepared and filed on behalf of Unkers International, indicating Ceres Trust and Donald Botkin II were Limited Partners in that business entity. See Exhibit 125. This is clear evidence of a limit on the ownership interest that Mr. Doerr may have acquired pursuant to his contractual arrangements with Mr. Henry and plaintiffs, particularly the Ceres Trust, a named plaintiff.

24. As noted above, Mr. Doerr testified regarding the parties' payment arrangements. He agreed to pay Patrick Henry $5,000 a month plus 10 percent of the gross, as reflected in Exhibit 53. During the trial, the following testimony also was received:

Q.  Okay. And so isn't it correct that Mr. Henry put, himself, put in writing to you a document that set forth what you were going to pay him?

A.  Yes.

Q.  Okay. And now you've testified that Mr. Henry and you had discussions where there was a variation from the

28

terms that are set forth in that document; correct?

A. Yes.

Q. And that was never put in any writing anywhere; correct?

A. No.

Q. So Mr. Henry put his understanding in writing, but you did not --

A. That's correct.

Q. -- correct?

In terms of the variation that you claim to have occurred; correct?

A. Not just me. It would have been a we, Patrick and I.

Q. Okay. But you never bothered to put that in writing?

A. No.

Q. All right. So with regard to the payments, would that obligation to start paying Mr. Henry be in more or less in -- well, not more or less. When would it have begun in the year 2000?

A. I don't remember when the exact month we were

supposed to start. Either February or March.

Q.    Okay. So if it were -- let's go ahead and use March,
      the latest month. That would be 10 out of the 12
      months of the year; correct?

A.    Yes.

Q.    And at $5,000 a month, that's $50,000; correct?

A.    Yes.

Q.    And that's not even counting the 10 percent of the
      gross; correct?

A.    Correct.

Q.    And I believe you've testified that you paid Mr. Henry
      in the year 2000 or Unker's International paid Mr.
      Henry in the year 2000 some -- I think it's in Exhibit O,
      which is underneath there, but it's about 30-some
      thousand dollars; correct?

A.    Correct.

Q.    Which is quite a bit less than the $50,000?

A.    Correct.

Q.    And doesn't include any gross payments?

A.    Correct.

Q.    All right. And the same questions with regard to 2001.
      Let's just talk about the first three months of 2001.
      That would be 15,000 for the monthly payments;
      right?

A.    Yes.

Q.    And then whatever the gross amount would come to
      would be on top of that?

A.    Yes.

Q.    Okay. And in terms of actual payments that you made
      to Mr. Henry for that year, money that you directed to
      be paid to him was $9,500; correct?

A.    Yes.

Q.    And the 6,000, that was money that you have testified
      that Mr. Henry obtained, um, after or as part of the
      raid; correct?

A.    Yeah, he stole it.

Q.    Your word.

A.    Well, what would you call it when they go into the bank

31

under false pretenses with false papers and from a
federally insured bank? He should have been in jail.

Q. Have you presented those false papers to the Court in
this case?

A. Um, they're probably here.

Q. With regard to, um -- I was a little unsure in your
direct testimony. Correct me if I'm wrong. I thought
I heard you initially say yesterday that the $6,000
came from the post office box.

A. No.

Q. And then today you say it came from a bank.

A. No. The 6,000 always came from the bank, and then
they stole the rest of the orders as well as the 940 tax
refund from the post office.

Q. Okay. But just to confirm, the $6,000 that they -- Mr.
Henry obtained in the year 2001 was not something
you actually paid to him; correct?

A. That is correct.

Q. So wouldn't it be correct to say that for both the years

32

2000 and 2001 that you were in default to Mr. Henry

in a big way with regard to what you owed him under

that agreement that is set forth in Exhibit 53?

A. Under this agreement, yes, but not under our, our

personal agreement between us.

Q. Which we don't have any proof of; correct?

A. That's correct.

Q. All right. Do you believe that your ability or Unker's

International LLC's ability to pay less than what's set

forth in that agreement was an open-ended right on

your part to pick when you were going to start paying

Mr. Henry what you owed him?

A. I believe what the agreement was is when we started

to make a profit and could actually pay him, which I

determined, I testified earlier, it was going to be what

I assumed to be a couple of years.

Q. Are you aware of the fact that the Henrys had no other

source of income during the period of time after you

started making Unker's products in the year 2000?

33

A.      I didn't know what sources they had.

Q.      But you're testifying it was going to be your decision as
        to when you could start paying Mr. Henry what you
        had agreed to pay him; is that right?

A.      Not necessarily mine.  I assumed or thought it would
        be a joint decision.

Q.      Did Mr. Henry have -- well, what participation would
        Mr. Henry have in that?

A.      When we were sending him, or in 2001 actually Don
        was actually delivering the cash himself, as stated on
        that Account Detail report, um, there were probably,
        um -- well, I don't know that that's for sure if there
        were computer sheets sent with that or not.

Q.      Couldn't Mr. Henry's attempt to conduct the, as you
        keep using the term, raid in April of 2001 been his
        attempt to finally change your -- in other words, his
        input.  You know, you had paid -- you had not paid him
        for long enough, and he was going to put a stop to
        that?

34

A.    All he had to do was stop sending us the juice.

Q.    Then what would have happened at that point?

A.    Then we'd have been shut down.

Q.    Well, would you have done anything about that at that
      point?

A.    Well, Don and I would have gotten our heads together.
      That's for sure.    They had no right to enter my
      building, especially under a phony court order.

Q.    Did they -- did Mr. Henry have the right to be paid
      what you agreed to have him paid -- what you had
      agreed to pay him?    Pardon me.

A.    Well, once again, we had our verbal mutual
      understanding, and we were paying him what we
      could.

Q.    All right.    Looking at those exhibits that are O[5] and P[6],

---

[5]Exhibit O, entitled Account Detail, reflects payments from January 1,
2000 to December 31, 2000 in the total amount of $32,599.65.

[6]Exhibit P, also entitled Account Detail, reflects a payment on January 12,
2001 in the amount of $2,000 and notes "future balance" in the amount of
$13,500, for a total of $15,500.00.

they -- if you want to go ahead and take a look at those, those are the Account Details?  Those are the Account Details that show what you paid to Mr. -- or Unker's International, again, paid to Mr. Henry in the year -- those two years; correct?

A.  Yes.

Q.  And those payments are referred to as royalties; correct?

A.  Yes.

Q.  Isn't that correct?  Do you understand what a royalty is?

A.  Yes, but when we set up our accounting system, that was just a word we used.  We didn't know what else to use.

Q.  What do you understand a royalty to be?

A.  Um, in this -- well, in this case basically it was we were buying the juice.

Q.  Well, does it --

A.  And I could have put on the accounting system, um,

36

"juice" if you want.

Q. But you put on the accounting system "royalties" correct?

A. Right, for -- it looked better, I guess.

Q. Well, what do you understand a royalty to be?

A. Um, payment for services or, um, materials offered or purchased.

Q. Does a royalty indicate that you have the right to use something but you don't own it?

A. I don't know. That's a legal question.

Q. All right. Now, getting back to the question of a writing, you -- how long were you a banker?

A. Approximately 20 years.

Q. Okay. And you worked in all aspects of banking; is that correct?

A. Yes.

q. And you also -- did that include making loans to people?

A. Back in the '70s I did, yes.

37

Q. Okay. And you've also described today in your testimony your relationship -- pardon me -- your franchise with the Arby's corporation?

A. Yes.

Q. I think you described the kinds of documentation that the Arby's corporation required of you as part of your agreement with them.

A. Yes.

Q. And getting back to your banking life, isn't it correct that any loans that you would make as a banker were evidenced in loan documentation and other writings between the bank and the customer?

A. Yes.

Q. And you thoroughly understood and -- how that process worked?

A. Yes.

Q. All right. But in this case you didn't enter into any writings with Mr. Henry other than what's set forth in Exhibit No. 53; correct?

A.    Yes.

Q.    You never put down on paper anywhere what the
      variations that you claim that were made; right?

A.    Yes.

Q.    Doesn't that fly in the face of your 20 years of banking
      experience?

A.    As I stated in the very first of my testimony, there was
      a real trust, uh, between us, and I trusted him and his
      word and what he wanted to do.  And yes, I should
      have put it in paper -- in writing.

Q.    Couldn't you have sent him a letter, an e-mail,
      anything at all that might have demonstrated what you
      say the variation to the agreement was?

MR. COPPEDE:  Objection, Your Honor: asked and answered about
three different times.

THE COURT:  Overruled.

Q.    (BY MR. KINGSTON) Go ahead.

A.    I've answered that several times.  No, I have not.

Q.    It wouldn't have been hard to do; correct?

39

A.   That's right.

Q.   If you had done that, would that have demonstrated

any lack of trust in Mr. -- to Mr. Henry?

A.   No.

Q.   Would that have shown any disrespect to him, in your

mind, if you had sent him something such as that?

A.   No.

Q.   Why didn't you do it?

A.   I messed up.

Transcript, Vol. III at 319-327.   The testimony continued:

Q.   Okay. And you testified about how you purchased out

of the foreclosure assets of the Unker's International

business; right?[7]

A.   Yes.

Q.   Did that include the trademark?

A.   As far as I was concerned, it did.

Q.   Do you know of any documentation that shows that the

_____

[7]See Exhibit Q for the Bill of Sale from Community First National Bank to
Pro 10 Originals, LLC.

bank, any of the banks, well, I guess there was just one ultimately, but had any collateral or security interest in the Unker's trademark?

A.   They didn't name it specifically, but it is part of their promissory note as intangibles.

Q.   Well, before we get to that, why don't we look at that bill of sale that is already an exhibit in the case.

A.   Yep.

Q.   Does that list a trademark in it?

A.   It's not listed separately, no.

q.   Okay. And, in fact, doesn't the document state that the bill of sale that you received covered all equipment, inventory, and supplies from Unker's International LLC?

A.   But not limited to.

Q.   Okay. But then -- sure fair enough. But then you go through the list that they give here, and there is no trademark listed; right?

A.   That's correct.

41

Q. And all of the, um, assets that are set forth there, those are hard assets, I want to say.

A. Yes.

Q. And you're a banker. You know better what I mean by that.

A. Yes.

Q. What are hard assets?

A. Well, those are the physical, the forklift and the air compressors and --

Q. But there's nothing intangible at all listed in that document; correct?

A. No.

Q. And I could go through all of the documentation with regard to the several loans with you, if you like, but would you agreement with me that none of the loan documentation that's been present in this case shows that Unker's International ever gave as collateral to the bank the trademark Unker's or the mark Unker's?

A. Other than, once again, on the promissory note it does

42

have -- I believe it's number 8 says intangibles, that

they are taking the security, the hard assets, and other

intangibles.

Q.    Could you point out to me what you are talking about?

A.    What's the exhibit --

Q.    It would be in the exhibits. I'm sorry, sure. Exhibits --

just give me a moment.

While I'm looking for these, in terms of a

promissory note, a promissory note isn't the document

that creates a security interest in a lending institution,

is it?

A.    It's all part of it.

Q.    Well, look at Exhibits L, M and N.

A.    Okay. On, on whatever -- L --

Q.    Exhibit L, all right.

A.    -- Okay, on number 1, Definitions, it shows properties,

any property, real, personal, or intangible, that secures

my performance of the obligation of this loan.

Q.    And that' s just a definitional section; correct?

A.    Yeah.

Q.    And that section doesn't say that, that intangibles were
      actually given by you to Community First Bank;
      correct?

A.    Yes.

Q.    And isn't it true that, again, I can show them to you if
      you like, but that the security, excuse me, the
      financing statements that are associated with those
      particular notes, there's a box on those financing
      statements for intangibles?  Correct?

A.    Yes.

Q.    And isn't it correct, and I am happy to show them to
      you if you want me to, but that that particular box for
      all of these notes is not checked, the intangibles box?
      Correct?

A.    I believe that's right.

Q.    And that intangibles box, and I will have you look at
      them in a second so the Court can see them as well,
      but that intangibles box, it lists all the different things

                              44

that are considered to be intangibles; correct?

A.    Yes.

Q.    And you would agree with me that one -- two of the
      things that are listed there are trademarks and trade
      names; correct?

A.    Yes.

Q.    And, once again, that box on the financing statements
      for all of these notes, it's never been checked by the
      bank; correct?

A.    Yes.

* * * *

(Plaintiffs' Exhibit 167 received.)

Q.    (BY MR. KINGSTON)  Okay.  So this is the financing
      statement  for  the  hundred-thousand-dollar  loan;
      correct?

A.    Yes.

Q.    And under paragraph 4 on the first page it references--
      says the financing statement covers the following types
      of property, and then it says see addendum.   Do you

see that under paragraph 4 on the first page? I'm

sorry.

A. This, this one here?

Q. Yes.

A. Okay. Yes.

Q. Do you agree with that?

A. Yes.

Q. Okay. And then the addendum is the second page;

right?

A. Apparently, yes.

Q. Okay. And then there's the boxes that I was talking

about before which would show what property the -- or

what boxes were checked; correct?

A. Yes.

Q. And there are three -- four of the boxes checked;

right?

A. Yes.

Q. The first one just says the following is collateral. And

then it -- the boxes for -- is that right?

46

A.     Yes.

Q.     And then the boxes for inventory, equipment, and
       accounts are checked; right?

A.     Yes.

Q.     And then the following box, general intangibles, is not
       checked; right?

A.     Yes.

Q.     And that's the one that specifically refers to
       trademarks and trade --

A.     Yes.

Q.     -- secrets and trade names; right?

A.     Yes.

Q.     And that box is not checked?

A.     That's correct.

Transcript, Vol. III at 328-337.  And, continuing:

Q.     * * * Do you know of any document that shows that
       Patrick Henry ever transferred to you the Unker's
       trademark?

A.     No.

47

Q.    And would you agree with me that no such document
      exists?

A.    Yes.

Q.    And you've agreed with me that Patrick Henry sent you
      -- pardon me. You've already testified that Mr. Henry
      sent you a version of the formula sometime in
      February of 2000; correct?

A.    Yes.

Q.    Okay. But you never actually used that formula that
      Mr. Henry sent you; correct?

A.    No.

Q.    And for the entire period of time up until April 10 of
      2001 you always relied on essential oils provided to
      you by Mr. Henry; correct?

A.    Yes.

Transcript, Vol. III at 338.

Q.    * * * * You have testified today about how Mike
      French came to Worland from Upton for a period of
      time; correct?

A. Yes.

Q. And remind me, when was that period that he came?

A. That would have been with Don probably in September.

Q. Of 2000?

A. Yes.

Q. And how long was Mr. French there in Worland at your facility or the facility?

A. I don't know.

Q. Can you give me a guesstimate?

C. I don't know.

Q. One week?  Two weeks?  A month?

A. It probably -- it had to be over a month by the time we -- when we discovered the, um, Visa transactions.  So we'd had to have gotten a statement there, so that would have been a month or more.

Q. And he came at Mr. Henry's direction?  Is that correct?

A. Yes.

Q. And he had an office at the Worland facility?

A.    Yes.

Q.    And he -- I know you've testified about some of the
      things you thought were -- you didn't like that he was
      doing, but what, what business-related matters was he
      involving himself with?

A.    Well, he's supposed to have been the office manager,
      but he wasn't.  He was just taking a few orders and
      playing cards.

Q.    He told you he was the office manager?

A.    That -- there was another document that came that,
      um, from Patrick -- there were lots of these documents
      flying around -- um, that was putting him as the office
      manager, and I don't remember what Don was, but I
      was the sales manager at that point.

Q.    And so you were made sales manager at that point in
      time; correct?

MR. COPPEDE:  Objection:  misstates his testimony.

Q.    (BY MR. KINGSTON)  Is that what you were made?

A.    In his mind, yeah, but it was my business.

50

Q. Okay. Did you object to that to Mr. Henry?

A. I had a real problem, once again, because he had this hammer and anvil over me on if I objected to any of this that I would not be receiving any of the formula or juice and he could cut me off, and I had an awful lot invested.

Q. Well, do you -- did he ever tell you that, Mr. Henry?

A. Tell me what?

Q. That he was going to cut you off if you did something he didn't like?

A. Not personally.

Q. So was that -- you say not -- so was that just an assumption or speculation that you had in your own mind about what might happen?

A. I'm pretty sure that's what would have happened.

Q. Well, but you never had any such discussion with Mr. Henry; correct?

A. No.

Q. And you never thought to at least discuss the matter

51

with him that he had sent Mr. French over and had, in
that process, had made you sales manager for the
company?

A.   No.

Q.   Doesn't that show that, in fact, you were under the
direction and control of Mr. Henry and you were not
independent, as you've tried to claim today?

A.   Only under -- in his mind. There was no -- he had no
ownership whatsoever in Unker's International. I'm
the one that put everything in, all money, all time, all
effort. Only thing he ever did was supply the juice.

Q.   Why didn't you ever discuss this issue with him, that is,
Mr. French coming over and what happened to your
position?

A.   Because I was afraid that they would pull the formula
from me and I'd be hung out to dry with all this debt
and then he takes everything back to Upton or
wherever, finds another front man.

Q.   Again, something he never told you; right?

52

A.     No.

Transcript, Vol. III at 345-348.

25.     Mr. Doerr's testimony as set forth above shows that he did not, in fact, receive the "entire business" from Mr. Henry.  Rather, the evidence showed that Mr. Henry retained significant controls over Mr. Doerr's business operations and the relationship was not a transfer or sale of a business and was more in the nature of a license or right to use and manufacture Unker's on certain terms and conditions, including payment of the flat fee and percentage of gross receipts.

26.     In addition, as Mr. Doerr testified, there was never any discussion between him and Mr. Henry regarding the transfer of the Unker's mark or name to the Defendants. See Transcript, Vol. III at 338.  The defendants also presented no documentary support or evidence to show that the plaintiffs transferred the mark to Mr. Doerr or the defendants.  With regard to such an important issue, given the state of the record evidence, the Court cannot conclude that the plaintiffs either transferred the "entire Unker's business" to the defendants or that they transferred the Unker's mark to him.

27.     As part of one of their fourth affirmative defense, the defendants also attempted to show that the plaintiffs abandoned the Unker's mark because

they did not manufacture or sell Unker's products for a period of time after April 10, 2001, the date the plaintiffs took steps to prevent the Defendants from continuing to make and market Unker's products. However, the evidence at trial showed that there was only a brief hiatus on the plaintiffs' part after April 10, 2001 in their manufacture and sale of Unker's products. Patrick Henry testified that the plaintiffs again sold Unker's products in the summer of 2001, only a few months after April 10, 2001. In addition, Defendants' Exhibit SS is an invoice of the plaintiffs showing an order for Unker's products to one of its customers. The invoice is dated July 30, 2001, also showing that the period of time that the plaintiffs did not sell Unker's products was very brief. The Court finds that this short interruption in the plaintiffs' sale of Unker's products is not sufficient to show that the plaintiffs abandoned use of the mark.

28. The defendants' final affirmative defense -- that the plaintiffs failed to name indispensable parties as plaintiffs in the case -- is also rejected. At trial, the defendants presented evidence and documents showing that Patrick Henry had created several different trusts, ostensibly for the purpose of shielding or hiding assets, including the Ceres Trust, Borne Investments, "Feronniere Financier," and the "United Israel Church Foundation." First, the Ceres Trust and Borne Investments were named by the plaintiffs as parties to

this case, so the defendants' affirmative defense with regard to these entities is unavailing and rejected.

29.    As to the other entities, as well as Ceres and Borne, the defendants' defense at trial appeared to be that it is these entities that somehow owned or controlled the Unker's mark and, by failing to name them, the proper parties were not actually before the Court.

30.    This defense or argument of the defendants fails as well. At trial, Patrick Henry testified that he first developed and started to use the Unker's mark in 1982 and that he owned and used it since that date. See Transcript, Vol. IV at 352 - 355. The defendants presented no evidence of any kind that contradicted this testimony and, as noted above, the defendants stipulated to the same. Further, neither the plaintiffs nor the defendants presented any evidence at trial that showed that Mr. Henry ever transferred the Unker's mark to the above-named trusts. Based on the evidence presented at trial, as a matter of law, Patrick Henry remained the owner of the Unker's mark at all times. Mr. Henry is a named plaintiff in this case and the Court may afford to Mr. Henry whatever relief he is entitled to under his trademark infringement claim, regardless whether any of these trusts or entities were named as parties to the case.

31.    The Court hereby finds and concludes that the plaintiffs have met their burden of proof on their trademark infringement claim brought under 15 U.S.C. § 1125(a). The Court also finds and concludes that the defendants have failed to carry their burden of proof on any of their affirmative defenses. The Court now turns to the remedies to which the plaintiffs are entitled on their infringement claim.

32.    The Court finds and concludes that the plaintiffs have exclusive rights in the name Unker's, UNKER'S, and its variants and that the defendants have no rights of any kind in those names or marks. The plaintiffs are entitled to a permanent and immediate injunction barring the defendants from continuing to use the Unker's mark, or any of its variants, in any sales, marketing or other activities involving personal care products or any other products.

33.    Pursuant to 25 U.S.C. § 1117, the Court may award the plaintiffs compensatory damages. Monetary recovery for violation of trademark rights is governed by 15 U.S.C. § 1117(a):

> When a violation of any right of the registrant of a mark . . ., or a violation under section 1125(a) of this title, shall have been established in any civil action . . . the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's

profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.   The court shall assess such profits and damages or cause the same to be assessed under its direction.   In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost and deduction claimed.   In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.   Such sum in either of the above circumstances shall constitute compensation and not a penalty.   The court in exceptional cases may award reasonable fees to the prevailing party.

See also Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1222 (10th Cir. 1998)

(Bishop I).

34.    There are several ways to measure damages in a trademark infringement case, including a plaintiff's actual business damages, his lost profits, punitive damages, and attorney's fees.  The most generally accepted and most straightforward measure of damages for trademark infringement is the profits gained by the infringer for his wrongful use of a trademark.  5 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 30.57 (2008).

35.    The Tenth Circuit generally finds that the infringer's profits are a proper and appropriate measure of damages.  See Bishop I, 154 F.3d at 1222-

57

23.  The Tenth Circuit, however, has noted that an award of damages is not

automatic, but depends on a weighing of the equities of the case:

There are three articulated justifications for awarding a portion of a defendant's profits to an injured plaintiff, only two of which are at issue in this case: prevention of unjust enrichment and deterrence of willful infringement. See Bishop I, 154 F.3d at 1222-23. The third justification, actual damages to the Estate, is not at issue in this case because the record clearly indicates that the Estate suffered no actual damages as a result of Equinox's infringing actions. See Bishop II, slip op. at 2-3.

In regard to the unjust enrichment theory of recovery, we have stated that a plaintiff may recover a portion of a defendant's profits even where the plaintiff was not actually injured by the defendant's unfair use of the disputed trademark.  See Bishop I, 154 F.3d at 1223.  "The infringer's use of the marketholder's property to make a profit results in unjust enrichment that may properly be remedied through an award of profits, 'even if the defendant and plaintiff are not in direct competition.'" Id. (quoting Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 585 (5th Cir. 1980) (emphasis added)).  This is because, as we have previously noted, "the courts have now settled on the theory that a [trademark] infringer is liable as a trustee for profits accruing from his illegal acts, even though the owner of the mark was not doing business in the consuming market where the infringement occurred."  Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 363 (10th Cir. 1954).

In regard to the deterrence of willful infringement rationale for awarding a portion of a defendant's profits, we have recognized that "several of our sister circuits have recognized that an award of profits may be proper, absent a showing of actual damage, as a deterrent to willful infringement,"  Bishop I, 154 F.3d at 1223 (citing cases from the Second, Ninth and Eleventh Circuit Courts of Appeals) (emphasis added), and we have implied that we would

58

similarly accept this rationale for awarding profits in a trademark infringement case. See id. at 1223-24.

While we have stated that trademark infringement "may properly be remedied through an award of profits," id. at 1223 (emphasis added), so that unjust enrichment of the defendant may be avoided or so that the defendant will be deterred from future wrongdoing, we have never stated that a plaintiff must necessarily be so compensated whenever a defendant wrongfully appropriates the plaintiff's trademarked property to make a profit. See id. To the contrary, we have emphasized: "An accounting of profits is not automatically granted upon a showing of infringement. Rather, the propriety of such relief is determined by equitable considerations. Consequently, the district court has wide discretion to fashion an appropriate remedy." Id. at 1222 (citations omitted); see also Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1405 (9th Cir. 1993) (stating that an accounting of profits will be granted only in light of equitable considerations).

In short, we have acknowledged that a showing of actual damages is not required to recover a portion of an infringing defendant's profits in a trademark action, and that plaintiffs in such cases may recover the defendants' profits based upon the alternative theories of the prevention of unjust enrichment and the deterrence of willful infringement. We have also instructed the district courts to fashion equitable remedies to meet the individual needs of each case, carefully weighing the equities on both sides of the scale to determine whether, in that district court's judgment and within its wide discretion, the plaintiff may receive a portion of the infringing defendant's profits.

Estate of Bishop v. Equinox Int'l Corp., 256 F.3d 1050, 1054-1066 (10th Cir. 2001) (Bishop II) (italics original). Also, this circuit holds that an award of a defendant's profits "requires a showing that defendant's actions were willful or

in bad faith." Bishop I, 154 F.3d at 1223 (citing International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, USA, Inc., 80 F.3d 749, 753 (2d Cir. 1996)).

36.   In this case, there is no evidence of actual damage to plaintiffs. Additionally, the equities of the case do not clearly or strongly favor either of the parties.   Mr. Doerr has used the mark, Unker's, over a period of time, as has Mr. Henry or Mr. Henry through his self-created entity, the United Israel Church.   The only evidence of customer confusion, the parties' stipulation that was offered and received during the course of trial, is relatively weak.   Evidence that the parties were actually in direct competition is similarly weak.   Both plaintiffs and defendants claimed to enjoy a world-wide market for Unker's products.   Two of the purposes of an award of a portion of a defendant's profits to an injured plaintiff are prevention of unjust enrichment and deterrence of willful infringement.   The Court may fashion equitable remedies to meet the individual needs of the case and may carefully weigh the equities on both sides of the scale to determine whether the plaintiff may receive a portion of an infringing defendant's profits.

37.   As the Court stated previously the equities in this case do not weigh heavily in favor of the plaintiff.   From the time they began doing business together in late 2000 through April 2001, Mr. Doerr used the mark with the

agreement and consent of plaintiffs. Until the disputes arose in 2001, when Mr. Henry thought that he was not being compensated appropriately, he had agreed to the defendants' use of the mark with little or no restriction, telling Mr. Doerr that it was "his business" to run as he saw fit. Only when Mr. Doerr and Unker's International were unable to pay the royalty and flat fee agreed upon did there appear to be any meaningful attempt by Mr. Henry to limit the defendants' use of the Unker's mark or even raise any question as to who had the right to use the mark. It does appear to this Court that plaintiffs are seeking a windfall based the defendants' use of the Unker's trademark. No one in this case is especially sympathetic and it appears to this Court that both parties are seeking to escape the burdens and benefits of a bargain that may not have been the wisest from its inception and failed to clearly and specifically memorialize the terms of the parties' agreement with respect to the ownership or use of the trademark for Unker's products.

38. The evidence offered as to defendants' profits included the testimony of Mr. Hay and Mr. Stine. Upon review, the differences between their computations as to profits earned by defendants, which is the proper measure of damages, were not significant. Mr. Hay testified that for the period 2001 through 2008, defendants' profits, were $242,229 (with accrued interest,

$262,129.00). Mr. Stine's testimony focused primarily upon the calculation of profits for plaintiff, but also expressed the opinion that Mr. Hay's analysis failed to include certain adjustments. He considered Mr. Hay's analysis and opined that Mr. Hay had failed to include certain adjustments to inventory, which would have resulted in a difference of $78,000.00. See Transcript Vol. V at 504-510. The Court finds that this adjustment is reasonable, and that the defendants' profits should be determined to be no more than $164,229 ($242,229.00 less $78,000).

39.   The evidence regarding actual losses claimed to have been suffered by plaintiff was likewise weak and incredible, if not completely absent. The evidence disclosed that plaintiffs did not maintain adequate books and records that would disclose their sales, costs of goods sold, taxes accrued and paid, or any other meaningful information likely to demonstrate the actual damages the plaintiffs may have suffered. There were no tax returns, financial statements or balance sheets for U.I.C. Unker's or for the Henrys individually. There was no paper trail evidencing their claims. Mr. Hay's opinions, as well as those of Mr. Stine, regarding plaintiffs' damages were based upon information provided orally by a woman named Diana McMillan and someone named Georgia, who apparently worked for Mr. Henry but did not appear or testify at trial. Mr. Hay

never visited plaintiffs or viewed the manufacturing set-up for UIC Unkers; Mr.

Stine did visit plaintiffs and was handed five tubs of paperwork to sift through

in order to reach some conclusions as to the damages or losses claimed to have

been suffered by plaintiffs.

40.   Defendants devoted a great deal of energy and time during trial

addressing the Henrys' apparent failures to comply with the requirements of the

Internal Revenue Service and their claims that the deal between Mr. Doerr and

Mr. Henry was fraudulent from its inception.[8]  However, the fraud claims were

not relevant to the trademark infringement claim in any way.  The Court did

_____

[8]It is not surprising that Mr. Doerr, with the benefit of hindsight, regrets his decision to do business with plaintiffs.  As the Tenth Circuit noted in Fru-Con Const. Corp. v. KFX, Inc., 153 F.3d 1150, 1159 (10th Cir. 1998):

>    Once a determination of sufficient consideration has been made, the adequacy of the consideration is generally not a proper subject for judicial scrutiny.  See 17A Am.Jur.2d Contracts § 135 (1991).  Although with hindsight Fru-Con's decision to enter into this agreement may have been a regrettable one,
>
> > [t]he policy of the law is to let parties weigh the benefits pro and con and leave them free to make whatever contract between themselves that they please.  The general rule of freedom of contract includes the freedom to make a bad bargain.
>
>    Bydalek, 947 S.W.2d at 143 (citations omitted).  Fru-Con is left with its bargain regardless of its wisdom or folly.  We decline to rewrite the agreement simply because the expectancy for which Fru-Con bargained did not come to pass.

63

consider the evidence offered, but does not find it helpful or dispositive in deciding the relevant issues in this case.  The Court also notes that any fraud alleged would have occurred in 1999 or 2000, when the parties entered into the agreement regarding the manufacture and sale of Unker's products.  The complaint in the above captioned matter was filed May 28, 2008; an amended complaint was filed July 1, 2008 and defendants' answer with affirmative defenses and counterclaims was filed July 28, 2008.  The pleadings in this matter also reflect that a civil action was filed in Wyoming District Court in Washakie County, Civil Action No. 2001-0073, and that a September 5, 2001 Order Granting Motion for Sanctions and Judgment for Money Damages was granted in favor of Gerald Doerr against Patrick Henry.  However, no evidence with respect to this action was presented during trial and any relief defendants have sought, including requests for orders in aid of execution, will be denied.

41.  The Court also notes that Wyo. Stat. § 1-3-105(a)(iv)(D) provides that civil actions for relief on the ground of fraud must be brought within four years after the cause of action accrues. Wyo. Stat. § 1-3-106 provides that a cause of action on the ground of fraud is not deemed to have accrued until the discovery of the fraud.  The evidence in this case clearly establishes that at the very latest defendants knew, or should have known, of the existence of their

claims in early 2000 or perhaps in 2001 when the civil action was concluded in state district court. Mr. Doerr testified he learned early in 2000 in a face to face meeting with Mr. Henry of Mr. Henry's self-given name change and of his philosophy regarding payment of taxes and similar matters. See Transcript, Vol. III at 231-233. Mr. Henry's preference for payments of fees and royalties to be made in cash rather than by check is certainly consistent with his claimed philosophical beliefs regarding non-cooperation with governmental entities.

42. After considering the equities evident in this case and the weak evidence of loss or damage to plaintiffs that was presented during trial, the Court finds and concludes that the most appropriate remedy for the defendant's infringement in the case is issuance of the permanent injunction preventing defendants' from using the Unker's mark, and all of its variants, and that injunctive relief will adequately deter willful infringement of the mark by defendants. The Court further finds and concludes that an award of a portion of defendants' profits is appropriate in this case, although not in the amount that plaintiffs have sought to recover. The Court will exercise its discretion to find and conclude that the plaintiffs are not entitled to a substantial windfall characterized as an award of defendant's profits. The Court further finds and concludes that an award of a portion of the defendant's profits in the amount

of $164,229.00 will deter future willful infringement by the defendants and prevent any unjust enrichment. The Court will exercise its discretion and will not award treble damages as requested by plaintiffs. The Court further finds that this is not an exceptional case that will justify an award of attorney's fees and therefore concludes that an award of attorney's fees is not appropriate in this case and that the parties' shall bear their own attorney's fees and costs.

Accordingly, it is therefore

**ORDERED** that defendants shall be, and are, permanently enjoined from using the trademark, Unker's, and all variants thereof, from the date of this Order. **It is further**

**ORDERED** that plaintiffs shall recover of defendants the sum of $164,229.00, an award of a portion of defendants' profits, for the prevention of unjust enrichment and deterrence of willful infringement. **It is further**

**ORDERED** that the parties shall bear their own costs and attorney's fees.

**Judgment shall be entered accordingly.**

Dated this 17th day of _March_ _____ 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

66